> **THIS OPINION IS A**
> **PRECEDENT OF THE T.T.A.B.**

Mailed:  March 30, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

**Opposition No. 91193427**

Edom Laboratories, Inc.

v.

Glenn Lichter

_____

Alec J. McGinn of Kunzler Needham Massey & Thorpe for Edom Laboratories, Inc.

Todd Wengrovsky of the Law Offices of Todd Wengrovsky, PLLC. for Glenn Lichter.

_____

Before Taylor, Ritchie, and Wolfson, Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

On August 12, 2009, Glenn Lichter ("applicant") filed an application for the standard character mark SUPER CHIRO TEA for "herbal teas for medicinal purposes" in International Class 5.[1]  Edom Laboratories, Inc., ("opposer") opposes registration of the mark on the ground

---

[1] Trademark application Serial No. 77803465, filed August 12, 2009 on the basis of applicant's bona fide intent to use the mark in commerce.  The word "TEA" in the mark has been disclaimed.

that it so resembles opposer's previously used mark CHIRO-KLENZ for a detoxifying herbal tea, as to be likely to cause confusion among purchasers.[2]

In the notice of opposition, opposer pleaded ownership of trademark application Serial No. 77843368 for the mark CHIRO-KLENZ for "herbal teas for medicinal purposes; nutritional supplement for eliminating toxins from the body."  Because the application issued as a registration on October 4, 2011,[3] prior to the close of opposer's testimony period, opposer is entitled to rely on the registration in this proceeding, as the issued registration has been properly made of record.  *See* authorities discussed in TBMP § 314 (3d ed. 2011).

Applicant has denied the salient allegations in the notice of opposition.

<u>THE RECORD</u>

By rule, the record includes applicant's application file and the pleadings.  Trademark Rule 2.122(b).

The parties have stipulated that they would seek determination of the merits of this case through the Board's Accelerated Case Resolution procedure ("ACR").  In

---

[2] Opposer's additional claims for lack of bona fide intent to use and non-ownership of the mark have been withdrawn.  In addition, although this case was consolidated with Opp. No. 91194813 during the pendency of the proceeding, on August 25, 2011, Opp. No. 91194813 was withdrawn and dismissed with prejudice.
[3] Reg. No. 4033118.

accordance therewith, the parties agreed to jointly file a stipulation of undisputed facts, and submit any additional evidence with their ACR briefs.  The parties filed a stipulation of undisputed facts on November 18, 2011 and each party filed additional evidence with its or his ACR brief during the briefing period.[4]

Applicant's evidence consists of the Declaration of Glenn Lichter with accompanying exhibits.  Opposer's evidence consists of a copy of the registration certificate for Reg. No. 4033118 as well as a TARR printout for the registration showing its current status and that title is vested in opposer; and the following declarations with accompanying exhibits as noted:

1. Declaration of Arthur Pollack, opposer's president.

2. Declaration of Allison Pollack, an employee of opposer.

3. Declaration of Martina Washington, a Naturopath at New Life Wellness Center in Washington, D.C.

4. Declaration of Harold Mitchell, owner of H and M Herbs and Vitamins in Ft. Oglethorpe, Georgia.

5. Declaration of Charles Joseph Reardon, private investigator.

6. Declaration of Alec J. McGinn, attorney with Kunzler, Needham, Massey and Thorpe, with accompanying exhibits.

7. Second Declaration of Alec J. McGinn, with an exhibit.

---

[4] Additional information regarding ACR is available in TBMP §§ 528.05(a)(2) and 705 (3d ed. 2011), and on the Trademark Trial and Appeal Board web page of the United States Patent and Trademark Office (USPTO) website at www.uspto.gov.

FINDINGS OF FACT

Based on the evidence of record and the undisputed stipulated facts, we make the following findings:

*Background Facts*

1. Opposer has been in the business of selling CHIRO-KLENZ tea since at least as early as the mid-1990's. Stip. Facts #6; Arthur Pollack Dec., ¶2.

2. Applicant is the President of, manages the day-to-day operations of, and is in a privity relationship to, Special Tea Plus, Inc. ("Special Tea") and Herb Naturals, Inc. ("Herb Naturals"). Stip. Facts #3.

3. The mark CHIRO-KLENZ was first used in connection with herbal tea in 1992. Stip. Facts #4.[5]

4. Special Tea owned a registration for CHIRO-KLENZ (Reg. No. 1760128) for "tea," which issued in 1993. Stip. Facts #5.

5. In 1997, Special Tea entered into a license agreement with opposer. Stip. Facts #6. Special Tea assigned its rights in the CHIRO-KLENZ mark, including Reg. No. 1760128, to opposer in exchange for a license back to Special Tea to use the CHIRO-KLENZ mark for tea as opposer's exclusive supplier. Stip. Facts #9 and #10; Assignment recorded at Reel/Frame 1982/0867.

---

[5] The parties dispute who, between them, originally developed the name CHIRO-KLENZ. Stip. Facts #5.

6. Reg. No. 1760128 was cancelled pursuant to Section 8 in the year 2000 due to opposer's failure to file an affidavit or declaration of use. Arthur Pollack Dec., ¶10.

7. Opposer re-filed for the mark CHIRO-KLENZ for "herbal tea for food purposes," and obtained Reg. No. 2459470 on June 12, 2001. Ibid.

8. Special Tea, and later Herb Naturals, continued to supply tea to opposer until opposer terminated the agreement in 2004. Stip. Facts #11 and #12.

9. Following termination of the agreement, opposer continued to sell tea under the mark CHIRO-KLENZ. Stip. Facts #13.

10. In January 2006, Special Tea filed a petition to cancel opposer's Reg. No. 2459470. Cancellation No. 92045380. The registration was cancelled on August 14, 2006, following entry of default judgment.

11. In May 2006, applicant filed an application of its own, and in October 2007 obtained, Reg. No. 3327764 for the mark CHIRO-KLENZ for "herb tea." Applicant sold tea under the mark until July or August of 2009, when applicant's registration was cancelled on the ground that applicant was not the owner of the mark. Stip. Facts #17, #19, #22 and #23; Cancellation No. 92049824, filed by opposer.

*Opposer's Present Use of CHIRO-KLENZ*

12. Opposer's use of the mark CHIRO-KLENZ for herbal tea continues to the present.  Arthur Pollack Dec., ¶2.

13.  Opposer sells CHIRO-KLENZ tea "through a network of health care professionals such as chiropractors, naturopaths, doctors, alternative health practitioners, [and] health spas."  Some practitioners also sell online.  Arthur Pollack Dec., ¶4.

14. Opposer's product is sold by the box; each box contains 30 bags.  Typical retail price falls between "about $11.50 to $20.00."  Id., ¶6.

15.  Sales for opposer's CHIRO-KLENZ brand tea from 2000 through November 2011 were "around 453,000 units of regular CHIRO-KLENZ and around 106,000 units of lemon CHIRO-KLENZ."  Id., ¶11.

16. Opposer's advertising expenses since 1992 were about $500,000 and included "expenses associated with attending trade shows, magazine advertising, direct mailings, [and] catalogs."  Ibid.

*Applicant's Present Use of SUPER CHIRO TEA*

17. Applicant began using the mark SUPER CHIRO TEA on or about August 12, 2009.  Lichter Dec., ¶32 and ¶33.

18. Applicant sells products under the mark SUPER CHIRO TEA "solely online directly to lay consumers."  Lichter Dec., ¶43, Stip. Facts # 27.

19. Applicant owns the domain names www.superchirotea.com and www.chiroklenzforless.com, which he has configured to redirect visitors to www.superchirotea.com. Stip. Facts # 29. Applicant also owns the domain name chiroteaforless.com. Lichter Dec., ¶65.

20. Applicant sells his product at a retail price of $8.49 for a box of 30 packets. Id., ¶ 45.

## STANDING AND PRIORITY

On March 1, 2011, the Board issued an order in this case, holding that "opposer has established its common law ownership of [the mark CHIRO-KLENZ] through use, thereby providing opposer with standing and priority in this matter." *Board Order,* p. 6.

In addition, because opposer's registration is of record, Section 2(d) priority is not an issue in this case as to the mark and the goods covered by the registration. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## LIKELIHOOD OF CONFUSION

We now turn to a discussion of likelihood of confusion under Trademark Act § 2(d), 15 U.S.C. § 1052(d).

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476

F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, Palm Bay Imp., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

## A. Strength of Opposer's Mark CHIRO-KLENZ/Third-party Uses

Applicant argues that opposer's CHIRO-KLENZ mark is inherently weak because "the product is sold to chiropractors and is for the purpose of cleansing." Applicant's Brief, p. 13. This argument is unavailing.[6] Although the term "klenz" may be seen as a variant spelling of "cleanse," suggesting, in connection with these goods, that the herbal tea purports to rid the body of toxins, this does not make the mark descriptive but suggestive only.

---

[6] Moreover, as applicant has not filed a counterclaim to cancel opposer's registration, any attempt by applicant to attack the validity of opposer's registration, such as by contending that the mark is merely descriptive, constitutes an impermissible collateral attack on the validity of the registration and has not been considered. *See* Trademark Rule 2.106(b)(2)(ii); *Fort James*

Further, to the extent the term "chiro" has any meaning because opposer sells its product to some chiropractors,[7] or may be a "popular root form meaning 'hand' or 'by the hand'" as applicant contends,[8] the term has not been shown to convey any information about the goods and does not make the mark descriptive. The mark as a whole is, at worst, suggestive.

Applicant also argues that opposer's mark is "further weakened by extensive third party use of CHIRO…."[9] However, applicant has not shown any relevant third-party uses of marks that include either "chiro" or, for that matter, "klenz" (or "cleanse") for similar or related products. The two web pages that applicant submitted for this purpose are inadmissible. There is no URL or date appearing on either page, as required under *Safer Inc. v. OMS Investments Inc.*, 94 USPQ2d 1031 (TTAB 2010). As for the Google® search summary, it is further inadmissible because it merely offers links to information not otherwise of record. *Cf. Calypso Technology, Inc. v. Calypso Capital Management, LP*, 100 USPQ2d 1213, 1219 (TTAB 2011)(Google search results

---

*Operating Co. v. Royal Paper Converting, Inc.,* 83 USPQ2d 1624, 1626 fn. 1 (TTAB 2007).
[7] Mr. Pollack states that opposer has sold its product in over 4,000 chiropractic offices across the country and has conducted some direct advertising "in publications for chiropractors and other healthcare professionals." Arthur Pollack Dec., ¶11.
[8] Applicant's Brief, p. 13.
[9] Applicant's Brief, p. 13.

summaries "which are more in the nature of listings of documents, i.e., the website pages that the summary links to, than to the documents per se" may not be made of record by notice of reliance).[10]

Likewise, while the listing that applicant has submitted, of third-party marks downloaded from the USPTO's Trademark Electronic Search System (TESS), is of record, the registrations listed therein are not of record, and the list itself has little, if any, probative value. The list consists of marks and their application or registration number, as well as a marker indicating whether, in the case of a registration, it is "dead" or "live." We cannot determine from a mere listing like this the nature of the goods or services for which these purported marks have been applied-for or registered and many of the marks themselves appear to contain substantial additional matter. The Board does not take judicial notice of registrations or applications residing in the Office,[11] and further, with respect to the applications, they are evidence of nothing more than that they were filed with the USPTO. *In re Jack B. Binion*, 93 USPQ2d 1531, 1535 fn.3 (TTAB 2009); *Glamorene*

---

[10] Even if admissible, the web pages have limited probative value. A web page for "chirojava" for coffee and a Google search summary consisting of a list of references touting various ways to lose weight or detoxify, have no bearing on how consumers would perceive "chiro" or "klenz/cleanse" for medicinal tea.
[11] *In re Jonathan Drew, Inc. d/b/a Drew Estate*, 97 USPQ2d 1640, 1644 fn. 11 (TTAB 2011).

*Products Corp. v. Earl Grissmer Co., Inc.*, 203 USPQ 1090, 1092, fn.5 (TTAB 1979). For the same reason, applicant's inclusion, in his brief, of a list of 4 live, and 3 dead, registrations that allegedly use the term "CHIRO" in International Class 5 is of no probative value.[12]

Applicant has not shown that opposer's pleaded mark CHIRO-KLENZ is so weak that it is entitled only to a narrow scope of protection.

### B. *Similarity of the Goods/Trade Channels/Purchasers*

We turn next to the *du Pont* factors which pertain to the similarity or dissimilarity of the goods, channels of trade and classes of purchasers. It is well settled that likelihood of confusion is determined on the basis of the goods as identified in the application and in the pleaded registration. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002).

Applicant's goods are identified as "herbal teas for medicinal purposes." Opposer's goods are identified as "herbal teas for medicinal purposes; nutritional supplement for eliminating toxins from the body." The goods, as identified in the application and pleaded registration, are in part identical. We need not consider applicant's

---

[12] Needless to say, the three pages from third-party websites showing herbal tea offered under the marks REVOLUTION and TRIPLE LEAF are entirely irrelevant.

remaining goods because likelihood of confusion as to one of the products listed in applicant's description of goods in that class is sufficient to support a conclusion that the opposition should be sustained. *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found if there is likely to be confusion with respect to any items that come within the identification of goods in the application). *See also, General Mills, Inc. and General Mills IP Holdings II, LLC v. Fage Dairy Processing,* 100 USPQ2d 1584, 1588 n.1 (TTAB 2011).

Because the goods in opposer's registration and applicant's application are the same in part, such goods are presumed to travel in similar trade channels and be purchased by the same classes of consumers. *See Genesco Inc. v. Martz*, 66 USPQ2d 1260, 1268 (TTAB 2003) (Where goods in applicant's application were in-part identical to those in registrant's registration, lack of restrictions as to trade channels or purchasers gives rise to presumption that goods "could be offered and sold to the same classes of purchasers through the same channels of trade"); *In re Smith and Mehaffey*, 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers"). Additionally, there is nothing in the recital

of goods in either the cited registration or the application that limits either registrant's or applicant's channels of trade, except for the common limitation, "for medicinal purposes." In other words, there is nothing that prevents applicant's "herbal teas for medicinal purposes" from being sold in the same stores and to the same classes of consumers as registrant's "herbal teas for medicinal purposes" (and vice-versa). Accordingly, we find that these *du Pont* factors weigh in favor of finding a likelihood of consumer confusion.

### C. Similarity of the Marks

We now turn to a consideration of the marks, keeping in mind that when marks would appear on identical goods, as they do here, the degree of similarity necessary to support a conclusion of likely confusion declines. *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Barbara's Bakery, Inc. v. Landesman*, 82 USPQ2d 1283, 1288 (TTAB 2007). In determining the similarity or dissimilarity of marks, we must consider the marks in their entireties in terms of sound, appearance, meaning and commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). Nonetheless, it is not improper to accord more or less weight to a particular feature of a mark. *In re National Data Corp.,* 753 F.2d 1056, 24 USPQ2d 749, 751 (Fed. Cir. 1983). Descriptive

matter, and matter that has been disclaimed because it is descriptive, is typically less significant or less dominant when comparing marks. *See In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531, 153334 (Fed. Cir. 1997); *In re Nat'l Data Corp.,* 224 USPQ2d at 752. *See also, Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000); *In re Code Consultants Inc.,* 60 USPQ2d 1699, 1702 (TTAB 2001) (a descriptive term is less significant in creating the mark's commercial impression).

We are further reminded that when comparing marks, the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in their entireties that confusion as to the source of the goods offered under the respective marks is likely to result. The purchaser's fallibility of memory over a period of time must be kept in mind. *See Spoons Restaurant Inc. v. Morrison Inc.,* 23 USPQ2d 1735 (TTAB 1991), *aff'd unpub'd* (Fed. Cir. 1992); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106 (TTAB 1975). As discussed further below, herbal teas are purchased by ordinary consumers who exercise no more than ordinary care in making their purchasing decisions.

In this case, applicant's mark consists of three words, the first being the laudatory word SUPER and the final word,

TEA, being generic for the goods.[13]  To the extent the term CHIRO has any meaning, as noted above it is suggestive only. Thus, unlike the descriptive or generic terms SUPER and TEA, the dominant and distinguishing portion of applicant's mark is the term CHIRO.

Turning to opposer's mark CHIRO-KLENZ, it is appropriate that we consider the term CHIRO to be the dominant portion of the mark and to accord greater weight to this dominant element in determining whether there is a likelihood of confusion between the parties' marks.  The term CHIRO, as the first part of opposer's mark, is "most likely to be impressed upon the mind of a purchaser and remembered."  *Presto Products Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988).  *See also, Palm Bay* 73 USPQ2d at 1692 ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); *Wet Seal Inc. v. FD Mgmt. Inc.,* 82 USPQ2d 1629, 1639 (TTAB 2007).

Comparing applicant's mark with opposer's mark, the overall similar commercial impressions created by the common presence of CHIRO in both marks creates a similar commercial impression that is not significantly changed by the addition

---

[13] Applicant recognized the descriptive nature of this term when he stated that he selected "the key term 'SUPER' [because the product] provides super results."  Lichter Dec., ¶33.

of the terms SUPER and TEA in applicant's mark, and the term KLENZ in opposer's mark. In fact, consumers may believe that SUPER CHIRO TEA and CHIRO-KLENZ are different varieties of the CHIRO line of tea.

Hence, despite the obvious differences in appearance and sound, we find the similarities of the marks in meaning and their overall commercial impression, when the marks are considered in their entireties, to outweigh their differences. Accordingly, the *du Pont* factor of similarity of the marks favors a finding of likely confusion.

### D. Conditions of Sale

Although applicant argues that opposer's health care professional customers are "highly sophisticated, and certainly able to differentiate between the products at issue,"[14] the same has not been alleged with respect to the end users of opposer's products or as to the ultimate users of applicant's goods. Applicant has not provided any showing that the end users of these products are sophisticated, and, as we have often noted, even consumers who exercise a higher degree of care are not necessarily knowledgeable regarding the trademarks at issue, and therefore immune from source confusion. *In re Wilson*, 57 USPQ2d 1863, 1865-66 (TTAB 2001). *See also, Carlisle*

---

[14] Lichter Dec., ¶48.

*Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers … are not infallible.").

With respect to the conditions under which the parties' goods are or will be purchased, despite the health benefits each party claims to result from using the goods, and even assuming, as applicant argues, that the products are relatively expensive when compared with non-medicinal teas, the low price of the products suggests that purchases are made by ordinary consumers who exercise no more than ordinary care in making their purchasing decisions. The conditions of sale are such that they would in no way diminish the likelihood of confusion in this case.

Accordingly, this *du Pont* factor is neutral.

### E. Actual Confusion

Opposer contends that there have been numerous instances of actual confusion among potential consumers of opposer's CHIRO-KLENZ tea, and has submitted four declarations in support of its contention.

Allison Pollack answers phones for opposer as part of her responsibilities as opposer's employee.[15] She states that she has received "between 10 and 15 phone calls where the caller either asked us for SUPER CHIRO TEA, or asked

---

[15] Allison Pollack Dec., ¶2.

what [opposer's] relationship is to SUPER CHIRO TEA."[16] She detailed six of these calls. For example, Ms. Pollack reports that one of the callers asked her if he could buy SUPER CHIRO TEA.[17] Another caller told her "he was not happy with the SUPER CHIRO TEA product."[18] These misdirected telephone calls are admissible under the hearsay exceptions set forth under Fed. R. Evid. 803(1)(present sense impression), as evidence of what Ms. Pollack heard and experienced during the conferences, or under Fed. R. Evid. 803(3)(state of mind), as statements revealing the declarant's state of mind. The statements are not offered for the truth of the statements but rather simply for the fact that they were made. *See, e.g., Toys "R" Us, Inc. v. Lamps R Us,* 219 USPQ 340, 346 (TTAB 1983)(out-of-court statements admissible to show "that people have, in fact, made an association" between the parties); *Finance Company of America v. Bank-America Corp.,* 205 USPQ 1016, 1035 (TTAB 1979, as amended 1980)(employees' testimony regarding receipt of misdirected mail or telephone calls not hearsay), *aff'd in unpub'd opinion, Appeal No. 80-558* (CCPA February 12, 1981). *See also, Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 217 USPQ 145, 149 n.10 (5th Cir.

---

[16] Id., ¶3.
[17] Id., ¶8.
[18] Id., ¶9.

1982)(testimony of plaintiff's employees regarding purchasers attempting to reach defendant admissible); *CCBN.com Inc. v. c-call.com Inc.,* 53 USPQ2d 1132, 1137 (D. Mass. 1999) ("Statements of customer confusion in the trademark context fall under the 'state of mind exception' to the hearsay rule").

Accordingly, we find that Ms. Pollack, opposer's employee, received telephone calls from actually confused consumers inquiring about applicant's SUPER CHIRO TEA. Nevertheless, the testimony is of minimal probative value in the absence of testimony from the third parties themselves "as to whether they were confused and, if so, what caused their confusion.  To the extent that this testimony has any probative value, however, it serves to buttress our conclusion of likelihood of confusion." *Corporate Fitness Programs, Inc. v. Weider Health and Fitness, Inc.,* 2 USPQ2d 1682, 1691 (TTAB 1987)(finding third-party testimony as to alleged incidents of actual confusion of "little probative value"), *set aside on other grounds by Corporate Fitness Programs Inc. v. Weider Health and Fitness Inc.*, 7 USPQ2d 1828 (TTAB 1988).

Opposer introduced additional testimony of alleged actual confusion.  Martina Washington, a Naturopath at New Life Wellness Center, ("New Life") stated that she sells CHIRO-KLENZ tea to her clients at New Life and that she

recently conducted an online search for CHIRO-KLENZ tea. During this search, Ms. Washington located applicant's SUPER CHIRO TEA and states that "I assumed that SUPER CHIRO was a new product from [opposer]."[19]

Harold Mitchell, the owner of H and M Herbs and Vitamins ("H and M") stated that he sells CHIRO-KLENZ herbal tea at H and M; that he "recently searched for CHIRO-KLENZ using google.com"; that based on the results of the search, he became concerned that opposer was selling CHIRO-KLENZ tea below the price at which H and M sold the product; and realized only after checking with opposer, that "I had mistaken the SUPER CHIRO tea being sold on the website for CHIRO-KLENZ tea manufactured and distributed by [opposer]."[20]

The existence of actual confusion is normally very persuasive evidence of likelihood of confusion and undercuts any possible claim that the marks are so dissimilar that there can be no likelihood of confusion. *See Thompson v. Haynes*, 305 F.3d 1369, 64 USPQ2d 1650 (Fed. Cir. 2002); *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 208 USPQ 384, 389 (5th Cir. 1980)("The best evidence of likelihood of confusion is provided by evidence of actual confusion").

---

[19] Washington Dec., ¶¶1-4.
[20] Mitchell Dec., ¶¶1-7.

Given the evidence of specific instances of actual confusion, this *du Pont* factor favors opposer.

### F. Applicant's Intent

Under the thirteenth *du Pont* factor, evidence of applicant's bad faith adoption of his mark is relevant to our likelihood of confusion analysis. *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1891 (TTAB 2008)(bad faith is strong evidence that confusion is likely, as such an inference is drawn from the imitator's expectation of confusion). *See also, J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991); and *L'Oreal S.A. and L'Oreal USA, Inc. v. Robert Victor Marcon,* ___ USPQ2d ___, Opp. No. 91184456 (TTAB March 20, 2012) slip op. at 25 (applicant's "demonstrated pattern of filing applications to register various well-known marks convinces us that applicant's adoption of [opposer's] mark was in bad faith").

Opposer argues that applicant took "affirmative steps to cause confusion and to associate SUPER CHIRO TEA with CHIRO-KLENZ tea."[21]  We agree.

In particular, opposer has produced copies of packaging of applicant's tea that include the tag line: "FROM THE ORIGINAL MAKERS OF CHIRO-KLENZ™".  Stip. Facts #26 and #27;

---

[21] Opposer's Brief, p. 43.

Exs. E and F.  Applicant also admits that he owns the domain name www.chiroklenzforless.com, and that he has configured it to redirect visitors to his www.superchirotea.com website.  Stip. Facts #29.

Applicant states that he did not intend to use testimonials from CHIRO-KLENZ tea users to promote SUPER CHIRO TEA, but does not deny that such testimonials were on his website.[22]  He also states that he did not intend "to substitute delivery of SUPER CHIRO TEA for an order of CHIRO-KLENZ," but again, does not deny that such delivery occurred.[23]  Mr. Charles Joseph Reardon, a private investigator, testified that on or about November 5, 2009, he placed an order for CHIRO-KLENZ tea through applicant's website www.superchirotea.com; that the electronic receipt he received indicated that the order had been placed, "referring to it as 'CK Original'"; but that when he received the shipment, "instead of CHIRO-KLENZ, the package I ordered contained SUPER CHIRO tea."  See *Tiffany & Co. v. Classic Motor Carriages Inc.*, 10 USPQ2d 1835, 1839 fn.5 (TTAB 1989)(materials received by witnesses from businesses they contacted considered to the extent that they prove that the businesses send out such materials upon request).

_____

[22] Lichter Dec., ¶61.
[23] Id., ¶62.

22

Applicant further declares that he uses "disclaimers and a highly-detailed product comparison page to make it crystal clear that I am not [opposer]"[24] and that he has removed all references to the mark CHIRO-KLENZ from his website.[25] The record belies applicant's assertions. None of the sample packaging submitted with applicant's or opposer's brief contains any disclaimer. The product comparison page does contain the following wording in small print: "Herb Naturals, Inc. is not affiliated with Edom Laboratories, Inc., the owner of the trademark "CHIRO-KLENZ™'"; however, the same webpage declares in large letters:

> "From the ORIGINAL Formulators
> of CHIRO-KLENZ™ Tea
> SUPER CHIRO™ TEA
> … Available NOW!"

The website www.SuperChiroTea.com also includes the disclaimer in small print, but prominently displays the "original makers" tag line directly above the mark SUPER CHIRO on the product packaging.[26]

Further, applicant's actions with respect to opposer's registrations for the CHIRO-KLENZ mark show a pattern of bad faith. Under the terms of the 1997 manufacturing and distribution agreement between the parties, the mark CHIRO-

---

[24] Lichter Dec., ¶56.
[25] Id., ¶¶59-60.

23

KLENZ, including Reg. No. 1760128, was assigned by Special Tea to opposer.[27] Nonetheless, in 2006, applicant filed a petition to cancel opposer's second registration for the mark[28] and continued to use the mark until, on June 18, 2009, upon opposer's petition to cancel, the Board determined that applicant did not own the CHIRO-KLENZ mark and cancelled applicant's registration No. 3327764.[29]

Further, applicant was aware that on February 16, 2010, the Federal District Court for the Eastern District of New York determined that opposer was likely to succeed on its trade dress claims, brought against applicant's use of opposer's blue box trade dress and yellow box trade dress.[30] Nonetheless, except for changing the color of his blue box to silver, applicant continues to use the trade dress (similar fonts, similar wording) that opposer uses for its CHIRO-KLENZ tea (regular); no changes were made to the yellow trade dress

---

[26] Web page from www.chiroteaforless.com accessed 12/5/11, attached to Opposer's Brief.

[27] Stip. Facts #18; Ex. C. In January 2008, the Supreme Court of the State of New York ruled that opposer did not breach the contract between the parties by terminating it in 2004. *Special Tea, Inc. v. Edom Laboratories, Inc.,* Case No. 000934/2005.

[28] Reg. No. 3327764; opposer obtained this registration after it failed to file a timely Section 8 affidavit in Reg. No. 1760128 and that registration was cancelled.

[29] *Edom Laboratories, Inc. v. Glenn Lichter, slip. op.,* Cancellation No. 92049824 (TTAB June 18, 2009).

[30] *Edom Laboratories, Inc. v. Special Tea Plus, Inc., et. al.,* in the United States District court Eastern District of new York, Case No. CV-09-5185 (SJF)(ETB). The case has been suspended pending our determination of the question of likelihood of confusion in this proceeding.

used by applicant for his lemon-flavored tea.[31]  Applicant also does not appear to have discontinued use of his domain name www.chiroklenzforless.com, which he admits redirects visitors to his website www.superchirotea.com.

This overwhelming evidence makes clear applicant's bad faith intent to cause, and profit from, consumer confusion. This *du Pont* factor thus weighs in opposer's favor.

### G. Conclusion

We find that the mark SUPER CHIRO TEA is similar overall in sight, sound, meaning and commercial impression to opposer's mark CHIRO-KLENZ; that the goods are legally identical and available to the same classes of consumers through similar trade channels; and that applicant has been trading off the goodwill in opposer's mark to opposer's detriment.  Accordingly, applicant's mark SUPER CHIRO TEA for "herbal teas for medicinal purposes" is likely to cause confusion with opposer's mark CHIRO-KLENZ for herbal teas and nutritional supplements.

**Decision**:  The opposition is sustained under Trademark Act Section 2(d) and registration to applicant is refused.

---

[31] Ordinarily, we do not look to the trade dress, which can be changed at any time.  But just as the trade dress may provide evidence of whether the word mark projects a confusingly similar commercial impression, *see Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984), here we look to applicant's retention of similar trade dress as providing evidence of whether he intended to cause confusion.